ROBERT M. MURPHY, Judge.
| STATEMENT OF THE CASE
On December 13, 2012, the Jefferson Parish Grand Jury returned an indictment charging defendant, Tory Wilson, with second degree murder in violation of La. R.S. 14:30.1. On December 20, 2012, a second count was added charging defendant with possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. Defendant was arraigned on January 14, 2013, and entered a plea of not guilty to the charges.
A motion hearing was held on June 27, 2013. The court denied defendant’s motion to suppress statement and motion to suppress identifications except for one witness, Jeffrey Benson.
On February 10, 2014, the trial commenced, and on February 13, 2014, a twelve-person jury returned a unanimous verdict of guilty as charged on both counts. On February 19, 2014, defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. On February 20, 2014, these defense motions were denied. Thereafter, as to count one, second degree murder, defendant was sentenced to life in prison at hard labor and, as to count two, | .^possession of a firearm by a convicted felon, defendant was sentenced to twenty years at hard labor. Both sentences were to be served consecutively and without benefit of parole, probation, or suspénsion of sentence.
On February 25, 2014, defendant filed a motion to reconsider sentence, requesting the court to declare his life sentence exces *907 sive and to impose a term in years. That same day, defendant filed a motion for appeal, which was granted on February 26, 2014. On March 27, 2014, defendant’s motion to reconsider sentence was denied.

FACTUAL OVERVIEW

On the evening of August 24, 2012, Stephanie South was chased throughout her home by a male with a gun who shot at and kicked in the front door of her West-bank apartment. She was shot 16 times both inside and outside of her apartment, and she died outside of her address at 539 Nel Court from the gunshot wounds, which included seven shots to her head.
Three eyewitnesses identified defendant as the man they saw either fire the weapon inside and outside the apartment or flee the scene. The identifications made by the three witnesses, Jacquel Huggins, Stacey Benson, and Taryn Norman, are the subject of the motion to suppress that was denied by the trial court. They were presented with photographic line-ups and identified defendant as the shooter. These witnesses further identified defendant at trial. The victim’s blood on defendant’s clothing was also verified through DNA analysis.
On the evening in question, Ms. South’s family members, neighbors, and friends gathered at her house to help her and her two children, ages 2 and 3, move back to St. Joseph.
Ms. Huggins, a longtime friend of the victim, came to New Orleans from St. Joseph on the date in question to help the victim move. She was inside Ms. |4South’s apartment when the events occurred. She testified that she and the children hid when the “banging” began on the front door. From her hiding place in the closet, she heard the initial shots and the front door being forced open. She testified that she was able to focus her sight on the armed defendant in the lighted bedroom through the hinged opening in the closet door. She saw defendant’s face twice as he passed the door. On being presented with a photographic line-up at the police station, she was able to limit her selection to two possible suspects. At trial, she was one hundred percent sure, however, that defendant was the assailant.
Ms. Benson, a neighbor living directly behind Ms. South, testified that she saw someone run away after hearing approximately 20 gunshots. She testified that she saw defendant’s face outside before he slouched over and ran away. She recognized defendant as someone she had seen on multiple occasions going to and from the victim’s apartment. At trial, she testified she was one hundred percent certain of her identification of defendant from the photo array.
Ms. Taryn Norman, a neighbor from across the street, testified that she first heard gunshots and, after relocating to her mother’s bedroom window, she saw an African-American man shoot the door and enter Ms. South’s apartment. She saw the victim exit and then fight the defendant, concluding with him standing over her and shooting her additional times. Ms. Norman testified that she recognized defendant as someone she had seen before and someone she perceived to be the boyfriend of her neighbor. She identified him from the photographic line-up presented by Detective Rhonda Goff.
Defendant made a statement confirming that he was at Ms. South’s apartment on the evening in question. Detective Goff testified that defendant related to her that he went to the apartment to sell some pills. She further testified that defendant ended his statement when she asked him about the weapon.
| Jefferson Parish Sheriffs Office DNA analyst David Cox, stipulated to be an *908 expert in DNA analysis, verified that the victim’s blood was found on defendant’s t-shirt.
Defendant complains that the identifications were suggestive based on what was visible on Detective Matt Vasquez’s computer screen in the presence of the witnesses. Detective Vasquez testified that he was made aware that a witness had potentially seen a photograph of defendant on his computer screen. A supplemental report indicated that a witness did see something after all the identifications had been made. Detective Vasquez testified that the photos on the screen did not contain the same photos used in the lineups. He further testified that the screen contained photos of individuals named “Tory Wilson” in the New Orleans area, but that it did not contain defendant’s photo. Ms. Benson testified that she did see a screen of four photos, but no one presented on the screen was the person she saw that night.

LAW AND DISCUSSION

In his first assignment of error, defendant argues that the trial court failed to suppress the identifications. He argues that the identifications were tainted in light of the alleged appearance of defendant’s photo on Detective Vasquez’s computer.
A defendant who seeks to suppress an identification must prove that both the identification itself was suggestive and that there was a likelihood of misiden-tification because of the identification procedure. See, e.g., State v. Higgins, 03-1980 (La.4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Pizzo, 575 So.2d 844 (La.App. 5 Cir.1991). An identification procedure is considered suggestive if the attention of a witness during a line-up display is unduly focused on that particular defendant. State v. Bradley, 11-1060 (La.App. 5 Cir. 9/25/12), 99 So.3d 1099, writ denied, 12-2441 (La.5/03/13), 113 So.3d 208; Pizzo, supra.
Even if the identification could be considered suggestive, it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, writ denied, 02-1457 (La.5/9/03), 843 So.2d 387 (citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).
“In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification.” Cowart, supra; State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161. A trial judge’s determination of the admissibility of an identification should be rendered great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Cowart, supra; Clennon, supra.
In State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, writ denied, 98-2435, 98-2438 (La.1/8/99), 734 So.2d 1229, photographic arrays were presented to the witness on two separate occasions, three days apart, and the witness did not identify anyone from these photographs. However, during the physical line-up one week later, the witness identified the defendant as the gunman. Id. On appeal, the defendant contended that the witness’s *909 identification was suggestive because he had previously seen the defendant in two photographic line-ups and because the defendant’s photograph was assigned number “3” in both l7a Polaroid array and in a physical line-up. Id. The defendant also contended a second witness’s identification was suggestive because after the first witness identified the defendant, he returned to the same room where the second witness was waiting to view the line-up, and thus, the first witness told the second witness to identify him.
In that case, this Court found that the identification procedures, which led to the witnesses’ identification of the defendant, were not suggestive. The first witness did not identify the defendant, or anyone else, in either of the photographic line-ups he was shown. The defendant’s speculative argument that the witness chose him out of the physical line-up because he remembered him as “number three” was unsupported by the record. The witness testified that no one forced or coerced him to make an identification and the witness identified the defendant at the suppression hearing. Similarly, the defendant’s allegations that the first witness must have told the second witness to identify him were not supported by the record. There was conflicting testimony at the suppression hearing and at trial regarding whether the witnesses were ever left alone in a room together.[1] Id. However, the second witness testified that she was not led to believe that she had to pick anyone out of the line-up, and she was not forced or threatened to identify anyone. Therefore, based on the reviewed evidence, this Court found that the witnesses’ identifications were not suggestive or tainted. Id.
Other cases have similarly held that an identification procedure was not suggestive even when the defendant’s photograph was repeated in another photographic line-up. See State v. Neslo, 433 So.2d 73, 77-78 (La.1983) (witnesses’ positive identification of the defendant from a physical line-up, after ^viewing several photographic lineups where only the defendant’s photograph was repeated, was not found to be suggestive); State v. Higgins, 01-368 (La.App. 5 Cir. 10/17/01), 800 So.2d 918, writ denied, 01-3267 (La.11/1/02), 828 So.2d 665, cert. denied, 538 U.S. 1038, 123 S.Ct. 2082, 155 L.Ed.2d 1070 (2003) (court found the identification procedure was not suggestive where the witness’s identification of the defendant was initially “tentative,” and thus a second photographic line-up with a more recent photograph of the defendant was presented).
Here, there was conflicting testimony as to whether the witnesses were shown any line-ups on the computer and whether other witnesses were in the room at the time of the questionable computer line-ups. At trial, Detective Vasquez testified that he investigated the matter after he was made aware that some witnesses, or a witness, had potentially “seen something on [his] computer screen.” He created a supplemental report relative to the investigation into that issue, which determined that a witness saw something on the computer after all the identifications had been made, and the detective believed it had no bearing on the case because it occurred after the identifications. He also testified that even if someone saw a photograph on his computer screen, it would not have been the same photograph used in the line-ups. Pertinent testimony from *910 the witnesses at the suppression hearing is discussed below.
Ms. Huggins testified that no one suggested whom she should pick on the computer; that she was not told she had to make an identification; and that no one forced or coerced her to pick someone. She testified she recognized someone, but she was not sure. She was then shown a different set of photos on a piece of paper by a female detective, and she first recognized number two. Per her testimony, the detective asked if she was going to stick with that one, but Ms. Huggins answered “no,” that he was not the correct one. She was told to take her time, and she | ^recognized and selected number one by the shape of his head, the way his ears were shaped, and the color of his Ups. At the time she chose the individual from the line-up at the police station and at the suppression hearing, she was one hundred percent certain “number one” was the same person that entered her friend’s home that evéning. She testified to the same information at trial, and stated she was sure “he was number one.” As for the computer screen, Ms. Huggins never testified that she saw only defendant’s picture on the computer screen prior to making an identification.
Ms. Benson did testify at the suppression hearing that she was fifty percent certain when she picked “number four.” However, at trial, she testified that she had told the State prior to the suppression hearing that her level of certainty was one hundred percent, and that when she answered fifty percent, she did not understand what she was being asked. At the suppression hearing, she^ testified that when she was shown images on a computer screen none of the individuals pictured looked familiar to her. A female police officer then took Ms. Benson into a room to show her a document containing a photographic line-up, and she identified defendant herein. She said she was in no way influenced regarding what picture to select. She testified that she did not see that particular photograph on the computer screen earlier, and that seeing the photographs on the computer screen did not affect her choice of the photograph of defendant.
With regards to Taryn Norman, while she did not immediately select an individual from the line-up, she eventually did pick defendant. She contends she was honest when admitting she was not one hundred percent sure it was defendant at the time of her selection and at the time of the suppression hearing. At the suppression hearing, she admitted it was between two people, and she was told to take her time. Neither the male detective nor the female detective suggested that |1(lshe pick someone from the line-up or forced, coerced, or threatened her into making a selection. She ultimately selected number one from the line-up as the person she believed to be the shooter. She testified she was not shown any pictures on a computer.[2]
Examining Calloway, supra, even if one witness, or multiple witnesses, were presented with a computer line-up, that does not automatically imply that the identification procedure was suggestive. In the instant case, there was conflicting testimony that defendant’s picture was even present in a computer line-up, but jurisprudence dictates that an identification procedure was not suggestive even when a witness is shown more than one line-up and even when the defendant’s photograph was repeated in other photographic line-ups. See Calloway, supra. Ms. Benson did not see the particular photograph on the computer screen that she ultimately chose from the *911 paper line-up. She testified that seeing the photographs on the computer screen did not affect her selection. Ms. Huggins did not make an official selection from the computer screen and instead chose from the paper line-up. Taryn Norman was never shown a line-up on a computer screen.
Similar to Calloway, supra, the witnesses did not select an individual other than defendant from the line-ups that they signed, and it appears none of the witnesses were coerced, threatened, or influenced into making a selection. Jurisprudence dictates that showing multiple lineups, even with the defendant’s photograph repeated, is not suggestive. Here, there was conflicting testimony as to whether a computer line-up was even presented to all of the witnesses.
Further, there was no evidence that a computer line-up influenced any witness’s identification and no evidence that both the identification itself was suggestive and that there was a likelihood of misidentification because of the Inidentification procedure. We conclude that the trial court did not abuse its discretion in- admitting the identifications of Ms. Huggins, Ms. Benson and Ms. Taryn Norman. See Cowart, supra; Clennon, supra.
Accordingly, we find that this assignment of error lacks merit.
In his second assignment of error, defendant contends that the trial court erred in imposing an excessive sentence.
Defendant argues that the trial court erred in failing to grant his motion to reconsider sentence. He argues that. “[w]hile it is true the victim was shot multiple times and her children were in the house, the court cited no factors that made this murder particularly heinous or gruesome.” Defendant acknowledges he was given the maximum sentence of twenty years on the charge of possession of a firearm by a convicted felon, and the trial court made the sentence consecutive to the mandatory life sentence that defendant received for second degree murder. Defendant reasons that the trial court failed to justify why the two sentences were made consecutive and “why it deviated from the law’s preference for concurrent sentences codified in La.C.Cr.P. art. 883 for acts arising out of the same set of facts and circumstances.” The crux of defendant’s argument is that the trial court did not sufficiently articulate why the two sentences were consecutive rather than concurrent.
Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution govern whether a sentence is constitutionally excessive and therefore invalid. A “sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.” State v. Nguyen, 06-969 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628. Furthermore, a “sentence is grossly disproportionate if, when the crime and punishment are considered in light of the |12harm done to society, it shocks the sense of justice” or makes no reasonable contribution to acceptable penal goals. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618. See also State v. Guzman, 99-1528 (La.5/16/00), 769 So.2d 1158. Although a sentence is within the statutory limits, it can be reviewed for constitutional éxces-siveness. State v. Petty, 12-278 (La.App. 5 Cir. 10/30/12), 103 So.3d 616. See also State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1.
When imposing sentence, a trial judge has broad discretion in imposing a sentence within statutory limits, and a reviewing court may not set aside a sentence *912 in absence of manifest abuse of discretion. State v. Hill, 12-495 (La.App. 5 Cir. 12/18/12), 106 So.3d 1209; State v. Williams, 08-3514 (La.12/13/04), 893 So.2d 7. On appeal, the issue is not whether a different sentence might have been more appropriate, but rather, whether the trial court abused its discretion. Hill, supra. See also State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127. Furthermore, if the record supports the sentence imposed, the appellate court shall not set it aside for excessiveness. State v. Cornejo-Garcia, 11-619 (La.App. 5 Cir. 1/24/12), 90 So.3d 458. In reviewing a trial court’s sentencing discretion, three factors are considered: “1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts.” State v. Alvarez, 08-558 (La.App. 5 Cir. 8/31/10), 47 So.3d 1018; State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646.
Typically, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Falkins, 04-250 (La.App. 5 Cir. 7/27/04), 880 So.2d 903, 911, writ denied, 04-2220 (La.1/14/05), 889 So.2d 266, and writ denied sub nom. State ex rel. Simms v. State, 04-2171 (La.5/20/05), 902 So.2d 1045; State v. Ross, 13-924 (La.App. 5 Cir. 5/28/14), 142 So.3d 327. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case and, therefore, is given broad discretion in sentencing. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996); Ross, supra.
La.C.Cr.P. art. 883 provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Thus, Louisiana law favors concurrent sentences for crimes committed as part of a single transaction. La.C.Cr.P. art. 883; Cornejo-Garcia, supra. See also State v. Underwood, 353 So.2d 1013 (La.1977). However, a trial judge retains discretion to impose consecutive penalties on the basis of other factors, “including the offender’s past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community.” Cornejo-Garcia, supra. See also State v. Thomas, 98-1144 (La.10/9/98), 719 So.2d 49 (per curiam).
If the trial court does elect to impose consecutive sentences for crimes arising from a single course of conduct, the court must articulate the reasons that it feels such a sentence is essential. Cornejo-Garcia, supra; State v. Blanchard, 03-0612 (La.App. 5 Cir. 11/12/03), 861 So.2d 657. While the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Petty, supra; State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11), 84 So.3d 611, writ denied, 12-0176 (La.9/14/12), 97 So.3d 1012. It does not however, require | uremand should the trial court fail to articulate its reasoning for imposing consecutive sentences as long as the record provides an adequate factual *913 basis to support the consecutive sentences. Cornejo-Garcia, supra; Blanchard, supra.
Furthermore, Louisiana jurisprudence supports the trial judge’s decision to impose consecutive sentences. See State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188. (two consecutive life sentences for two counts of first degree murder not constitutionally excessive for defendant that murdered his five-year-old son and his two-year-old daughter); State v. Hawkins, 06-1599-(La.App. 3 Cir. 5/2/07), 956 So.2d 146, writ denied, 07-1156 (La.12/7/07), 969 So.2d 627 (12-year sentence for two counts of simple burglary to run consecutive to ten-year sentence for seventeen counts of theft of a firearm not constitutionally excessive); and State v. Smith, 44,998 (La.App. 2 Cir. 3/31/10), 34 So.3d 386, writ denied, 10-0980 (La.12/10/10), 51 So.3d 722 (two consecutive life sentences for two counts of second degree murder not constitutionally excessive for recidivist defendant convicted of ambush murder of two police officers where the trial judge provided ample justification in the imposition of the sentences).
In Petty, supra, the defendant was sentenced to consecutive terms of forty years at hard labor for conspiracy to commit armed robbery, and life imprisonment at hard labor for second degree murder. Petty, supra. In imposing the consecutive sentences, the trial judge articulated reasons for the sentences and noted the defendant’s cold, calculated callousness toward the victim during the commission of the offense, the defendant’s lack of remorse, the use of a dangerous weapon during the commission of the offense, and the defendant’s knowledge that he created a risk of death to the victim. Id.
|1KThis Court held that “considering the trial court’s reasons for the imposition of consecutive sentences, the circumstances surrounding the offense, including the defendant’s brazen disregard for the victim, and the defendant’s criminal history,” the sentences imposed, even though consecutive in nature, were not constitutionally excessive. Id.
In Cornejo-Garcia, supra, the trial judge imposed three consecutive sentences of life imprisonment at hard labor for four counts of murder, and the defendant argued his consecutive sentences were excessive because, inter alia, the trial court failed to specify reasons for the consecutive nature of the offenses. Cornejo-Garcia, supra. The trial judge, however, specifically imposed consecutive sentences based upon the fact that the defendant and his accomplices premeditated an armed robbery, which resulted in four deaths. Id.
The testimony elicited the fact that only the defendant and one other accomplice fired weapons during a “second volley of gunfire” which killed two victims. Id. This Court found that given the gravity of the defendant’s offense, the articulated reasons by the trial judge, and the supporting jurisprudence, there was no abuse of the trial court’s discretion in imposing three consecutive life sentences. Id.
Here, the trial judge was clear when sentencing defendant consecutively for the two offenses, articulating his reasons for the sentences specifically for the aid of any appellate court that potentially would review defendant’s sentence. Immediately upon sentencing defendant, the trial judge stated:
And so that the record is clear for any appellate court that might look at this and allege cruel and unusual punishment charge for my having sentenced you consecutively in this matter, I want it to be clear that this record, the record of this trial is very clear evidence of your *914 cruel and unusual punishment of Stephanie South. The fact that you, while on parole for a weapons violation, chased her, chased Stephanie South throughout her house, throughout her apartment, in the presence of her |1(itwo young children as she repeatedly begged for her life, and you repeatedly fired at her from behind, pumping more than a dozen bullets into her body—
At which point, defendant interrupted the judge several times. Subsequent to the trial judge finding defendant in contempt of court, the judge continued to articulate his reasoning for defendant’s maximum sentence that ran consecutively with his life sentence:
The jury unanimously found you, Mr. Wilson, guilty after having heard all of the evidence, and again, I’m simply stating for the record my reasons for sentencing you in the manner in which I am so that the appellate court when it looks at it in the future will know that this was not some whim, this was the considered opinion of this Court that you are — in fact, any lesser sentence would denigrate the seriousness, the atrocities that you committed upon Stephanie South.
The record ' reflects that defendant chased Ms. South throughout her apartment and shot her multiple times inside and outside of her home, leaving her for dead. Testimony at trial demonstrated that three children, two of whom were Ms. South’s own children, and one adult witness were in the home when defendant shot at the door to the house, went up the stairs, and entered the room with a gun. Testimony also demonstrated Ms. South was pleading with defendant to stop, while within earshot of her children. Defendant did not heed Ms. South’s pleas, instead opting to shoot her sixteen times.
Here, we find, as in Petty and Comejo-Garcia, that the trial judge provided specific justification to sentence defendant consecutively. We further find defendant’s offenses to be equally as grave and the trial judge’s reasoning equally as thorough and persuasive as the supporting jurisprudence. Examining the trial judge’s carefully specified reasoning, the circumstances surrounding the offense, defendant’s disregard for the victim, and relevant jurisprudence, we find that the |17trial court did not abuse its discretion by imposing consecutive sentences, and the record supports such sentencing.[3]
Turning to the constitutional ex-cessiveness argument, we find this issue likewise lacks merit. The sentencing range for a defendant found guilty of possession of a firearm by a convicted felon is imprisonment at hard labor for not less than ten, nor more than twenty years, without the benefit of probation, parole, or suspension of sentence. La. R.S. 14:95.1. Defendant was sentenced to the statutory maximum period of imprisonment, twenty years.
In State v. Gailes, 13-2209 (La.App. 1 Cir. 6/6/14), 2014 WL 3843883, at *7, 2014 La.App. Unpub. LEXIS 367, at *18, the defendant was found guilty of manslaughter and possession of a firearm by a convicted felon, and he was sentenced to the maximum term of twenty years at hard labor for violating La. R.S. 14:95.1, and on appeal argued that there was simply not enough evidence in the record to support *915 the maximum sentence. At the sentencing hearing, the trial court heard an impact statement from the victim’s mother and the court noted that the defendant had a prior criminal history and his own choices led to the victim’s death. Id. Considering those factors, the trial court concluded the defendant was of the worst class of offenders and the appellate court found the trial court did not abuse its discretion in sentencing the defendant to the maximum sentence. Id.
Because the statutory maximum recently changed from fifteen years to twenty years, there is a lack of jurisprudence where the defendant was sentenced to the maximum of twenty years but considerable case law upholding the maximum sentence of fifteen years for felon in possession of a firearm where the defendant has prior convictions. See State v. Crawford, 03-1494 (La.App. 5 Cir. 04/27/04), 873 So.2d 768, writ denied, 04-1744 (La.5/6/05), 901 So.2d 1083 (the defendant had previous convictions for crimes of violence and a propensity for recidivism, and thus the trial judge did not abuse his discretion in imposing the maximum sentence on the defendant); State v. Taylor, 04-689 (La.App. 5 Cir. 12/14/04), 892 So.2d 78 (the defendant had numerous felony convictions and the trial court did not abuse its discretion in imposing the maximum fifteen-year sentence).
Here, it was established in trial that defendant was previously convicted for the crime of possessing a dangerous weapon, specifically a .357 caliber chrome revolver handgun while possessing a controlled dangerous substance, to wit: cocaine, in violation of La. R.S. 14:95(E). He received an eight-year jail sentence and was released on parole in March of 2012. Defendant was on parole at the time of the instant murder. The trial judge articulated a lengthy and thorough explanation for defendant’s maximum sentence. While no victim impact statements were read, the judge considered testimony of all of the witnesses to determine that defendant was of the worst class of offenders who, “while on parole for a weapons violation, chased her, chased Stephanie South throughout her house, throughout her apartment, in the presence of her two young children as she repeatedly begged for her life.... ” Accordingly, we find that the trial judge did not abuse his discretion when sentencing defendant to the maximum sentence.
Accordingly, this assignment of error lacks merit.

ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
We find that the trial court failed to notify defendant of the two-year prescriptive period for filing an application for post-conviction relief, as is required |19by La.C.Cr.P. art. 930.8. The commitment does specify that the court appropriately informed defendant of said prescriptive period while the transcript does not. Where there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). By means of this opinion, we correct the error and inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. C.Cr.P. art. 914 or 922. State v. Drewery, 12-236 (La.App. 5 Cir. 1/30/13), 108 So.3d 1246; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, writ denied, 09-158 (La.10/16/09), 19 So.3d 473.
*916 Second, we find that defendant received an illegally lenient sentence regarding a mandatory fíne. La. R.S. 14:95.1(B) requires a mandatory fine of “not less than one thousand dollars nor more than five thousand dollars,” and that fine was not imposed. This Court has held that a statute, providing for a fine of “not more than” a specified amount, does require a mandatory fine. State v. Richardson, 09-714 (La.App. 5 Cir. 2/9/10), 33 So.3d 903, writ denied, 10-0526 (La.10/15/10), 45 So.3d 1109. However, this Court has noted that the matter is not free from doubt. Id.; See also State v. Kerlec, 06-838 (La.App. 5 Cir. 4/11/07), 957 So.2d 810, writ denied, 07-1119 (La.12/7/07), 969 So.2d 626.
In State v. Grant, 04-341 (La.App. 5 Cir. 10/26/04), 887 So.2d 596, this Court noted that it had the authority to correct an illegally lenient sentence, even though neither party had raised the issue below or on appeal; however, that authority is permissive rather than mandatory. It was noted, however, that this Court has, on occasion, declined to remand for imposition of a mandatory fine. Id.
12()The Louisiana Supreme Court has held that an appellate court has the authority under La.C.Cr.P. art. 882 to correct an illegally lenient sentence at any time, even if the issue of an illegal sentence was not raised by either the defendant or the State. Richardson, supra. See also State v. Campbell, 08-1226 (La.App. 5 Cir. 5/26/09), 15 So.3d 1076, writ denied, 09-1385 (La.2/12/10), 27 So.3d 842 (citing State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790). Since that holding, “this Court has used that authority to notice the failure of the trial court to impose a mandatory fine and the authority to remand the matter to the trial court for imposition of a mandatory fine.” Richardson, supra. However, often in indigent defender matters, this Court has decided not to use this authority. Id.; See also Campbell, supra.
In State v. Horton, 09-250 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, this Court declined to remand the matter for imposition of the mandatory fine due to the defendant’s indigent status, noting the following:
This Court has the authority to correct an illegally lenient sentence. La.C.Cr.P art. 882. However, this authority is permissive rather than mandatory. Recently, in State v. Campbell, 08-1226 (La.App. 5 Cir. 5/26/09), 15 So.3d 1076, this Court noted defendant’s indigent status and declined to correct an illegally lenient sentence where the district court failed to impose a mandatory fine. In the present case, it is noted that defendant is indigent, since he is represented by the Louisiana Appellate Project, which provides appellate services for indigent criminal defendants in non-capital felony cases. Due to defendant’s indigent status, we decline to remand this matter for imposition of the mandatory fine. Id.
Here, we similarly elect not to remand for imposition of the mandatory fine. Defendant was represented by Louisiana Appellate Project, indicating he was an indigent criminal defendant. Based on this Court’s jurisprudence, we decline to correct defendant’s illegally lenient sentence and decline to remand this matter for this pin-pose.
| ?adecree
For the foregoing reasons, Troy Wilson’s conviction and sentence are affirmed.

CONVICTION AND SENTENCE AFFIRMED

. The detective testified differently at the suppression hearing and trial regarding whether the two witnesses were left together. Callo-way, supra. The witnesses testified that they were not left together after an identification was made. Id.

. Another witness, Sandra Norman, did not select anyone from the line-ups.

. Moreover, even if the trial judge erred in imposing consecutive rather than concurrent sentences, the error was harmless in light of the fact that the defendant was sentenced, on the second degree murder conviction, to the mandatory term of life imprisonment without benefit of parole, probation, or suspension. Petty, supra; State v. Puckett, 02-997 (La.App. 5 Cir. 1/28/03), 839 So.2d 226, writ denied, 03-891 (La.12/12/03), 860 So.2d 1148.